## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ANTHONY ST. JOSEPH JONES,

     Petitioner,

-vs-                                Case No.  8:05-cv-085-T-27MSS

JAMES V. CROSBY, JR.,

     Respondent.

_____/

### ORDER

Before the Court is a petition for writ of habeas corpus filed by an inmate in a Florida penal institution *pro se* pursuant to 28 U.S.C. § 2254 challenging a sentence entered by the Thirteenth Judicial Circuit Court, Hillsborough County, Florida. Petitioner's challenge relates to his 1998 conviction for one count of second degree murder with a firearm. Respondent filed a response to the Petition (Dkt. 13), and Petitioner filed a reply to the response (Dkt. 14). The matter is now before the Court for consideration on the merits of the petition.

### Background

Following a jury trial, Petitioner was found guilty of second degree murder with a firearm and sentenced to thirty (30) years imprisonment in 1998 (Dkt. 8, Ex. 001). Represented by counsel, Petitioner filed a direct appeal asserting one issue: whether the trial court erred in denying his motion to suppress his confession (Dkt. 8, Ex. 003). The conviction and sentence were summarily affirmed in a per curiam opinion on June 25, 1999 (Dkt. 8, Ex. 005); *See Jones v. State,* 743 So.2d 517 (Fla. 2nd DCA 1999) (Table).

Petitioner filed a motion for state post-conviction relief pursuant to Fla. R. Crim. P. 3.850 on February 22, 2000 (Dkt. 8, Ex. 007).  On April 24, 2001, the state trial court issued an order summarily denying a number of Petitioner's claims, and instructing the State to respond to the remaining claims (Dkt. 8, Ex. 009).  On May 15, 2001, the State filed its response to the remaining claims (Dkt. 8, Ex. 010).  On September 19, 2001, the state trial court denied a number of the remaining claims, and determined that an evidentiary hearing was necessary to resolve two of the remaining claims (Dkt. 8, Ex. 011).  An evidentiary hearing was held on March 28, 2002, regarding the two remaining claims (Dkt. 8, Ex. 012).  Following the evidentiary hearing, the state trial court denied Petitioner's remaining two claims (Dkt. 8, Ex. 013).  Petitioner filed an appeal of the denial of his Rule 3.850 motion (Dkt. 8, Ex. 014).  On August 22, 2003, the appellate court per curiam affirmed the denial of his Rule 3.850 motion (Dkt. 8, Ex. 018); *See Jones v. State*, 856 So. 2d 994 (Fla. 2nd DCA 2003)[Table].  The appellate court issued its mandate on September 15, 2003 (Dkt. 8, Ex. 019).

In his reply, Petitioner asserts that on March 17, 2004, he filed a Rule 3.800(a) motion to correct illegal sentence, the motion was granted, and on December 7, 2004, he was re-sentenced (Dkt. 14 at 4).  Petitioner provided an order from the state trial court dated November 3, 2004, in which the court granted Petitioner's motion to correct illegal sentence and scheduled a re-sentencing hearing for December 7, 2004 (Dkt. 15 at 8-9).  He asserts that his original 30 year sentence was reduced to a 15 year sentence (Dkt. 15 at 1).  The Court takes judicial notice of information available on the database maintained by the Clerk of Court, Thirteenth Judicial Circuit, Hillsborough County, Florida, http://www.hillsclerk.com, viewed on February 25, 2008, which indicates an amended sentence date of December 7, 2004.  *See* Fed. R. Evid. 201. The Court also takes judicial notice of

the Florida Department Of Corrections Offender Information Network record, viewed on February 25, 2008, which indicates that Petitioner is serving a fifteen year prison sentence for the second degree murder offense.

Respondent does not dispute that Petitioner has exhausted his available state court remedies. Respondent does, however, dispute that he filed the pending federal petition for writ of habeas corpus within the federal limitations period (Dkt. 13 at 5-9). The Court has reviewed Respondent's argument on the timeliness of the Petition and finds that it is without merit. "AEDPA's statute of limitations runs from the date the judgment pursuant to which the petitioner is in custody becomes final, which is the date both the conviction and sentence the petitioner is serving become final." *Ferreira v. Sec'y, Dep't of Corr.*, 494 F.3d 1286, 1288 (11th Cir. 2007). Therefore, Petitioner is in custody pursuant to the 2004 judgment, which is based on the 1998 conviction and the December 7, 2004 sentence. *See, id.* at 1292. Accordingly, Petitioner's petition is timely because he filed it on January 11, 2005, well within the one-year statute of limitations. *See* 28 U.S.C. § 2244(d).

Nevertheless, having reviewed the record, the arguments presented by the parties, and applicable statutes and controlling case law, the Court finds that Petitioner has not established that he is entitled to federal habeas relief.

### Evidentiary Hearing

The Court has carefully reviewed the record and concludes Petitioner is not entitled to an evidentiary hearing. *See Smith v. Singletary*, 170 F.3.d 1051, 1053-54 (11th Cir. 1999). The pertinent facts of the case are fully developed in the record before the Court. *See Cave v. Singletary*, 971 F.2d 1513, 1516 (11th Cir. 1992). Thus, no additional evidentiary proceedings are required. *See High v.*

*Head*, 209 F.3d 1257, 1263 (11th Cir. 2000), *cert. denied*, 532 U.S. 909 (2001) (citing *McCleskey v.*

*Zant*, 499 U.S. 467, 494 (1991)).

### Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), signed

into law on April 24, 1996, amended the statutes governing federal habeas relief for state prisoners.

Because Petitioner filed his petition after April 24, 1996, the AEDPA provisions are applicable to

the petition. *See Wilcox v. Florida Dep't of Corrections*, 158 F.3d 1209, 1210 (11th Cir. 1998), *cert.*

*denied*, 531 U.S. 840 (2000). Where a state court initially considers the issues raised in the petition

and enters a decision on the merits, 28 U.S.C. § 2254(d) governs the review of those claims. *See*

*Mobley v. Head*, 267 F.3d 1312, 1316 (11th Cir. 2001), *cert. denied*, 536 U.S. 968 (2002) (finding

that the court must deny the writ unless one of two § 2254(d) exceptions applies).

Section § 2254 creates a deferential standard for federal court review of state court

adjudications. In pertinent part, § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an
>       unreasonable application of, clearly established Federal law, as
>       determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable
>       determination of the facts in light of the evidence presented in
>       the State court proceeding.

28 U.S.C. § 2254(d). The Eleventh Circuit interpreted the new standard in *Putman v. Head*:

4

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are separate bases for reviewing a state court's decisions. *See Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000). A state court decision is "contrary to" clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case. *See Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000).

A state court conducts an "unreasonable application" of clearly established federal law if it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case.    *See id.* An unreasonable application may also occur if a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context. *See id.* Notably, an "unreasonable application" is an "objectively unreasonable" application. *See Williams*, 529 U.S. at 412, 120 S.Ct. at 1523.

Lastly, § 2254(d)(1) provides a measuring stick for federal habeas courts reviewing state court decisions. That measuring stick is "clearly established Federal law." 28 U.S.C. § 2254(d). Clearly established federal law is *not* the case law of the lower federal courts, including this Court. Instead, in the habeas context, clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state court decision." *Williams*, 529 U.S. at 412, 120 S.Ct. at 1523.

268 F. 3d 1223, 1241 (11th Cir. 2001) (footnotes omitted).

Because a state court initially considered the issues raised in the petition and entered a decision on the merits, § 2254(d) governs the review of Petitioner's claims. *See Mobley*, 267 F.3d at 1316. In a decision addressing the level of deference a federal habeas court should accord the state court's decision under § 2254(d), the Supreme Court stated:

A federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system. . . . [however], deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A petitioner has the burden of overcoming all state court factual determinations by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) ("a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

### Discussion

In his petition for federal habeas relief, Petitioner raises the following claims:

1. His Fifth and Fourteenth Amendment rights were violated when the state trial court denied his motion to suppress the statements he made to F.B.I. agents without a knowing and intelligent waiver of his rights under Miranda.

2. His Sixth Amendment right to effective assistance of counsel was violated when counsel failed to call Dondrue Faure as a witness.

3. His Sixth Amendment right to effective assistance of counsel was violated when counsel failed to call Petitioner's employer as a witness.

4. His Sixth Amendment right to effective assistance of counsel was violated when counsel failed to follow Petitioner's trial strategy and failed to present a valid defense.

5. His Sixth Amendment right to effective assistance of counsel was violated when counsel failed to object to the trial court giving a jury instruction on self-defense.

The claim raised in Ground One was raised by Petitioner on direct appeal and rejected. *See Jones v. State,* 743 So.2d 517 (Fla. 2nd DCA 1999) (Table). Although the appellate court issued its decision without written opinion, the Eleventh Circuit has held that a state court's summary rejection of a federal constitutional issue qualifies as an adjudication on the merits under § 2254(d) so that the summary rejection is entitled to the same deference as a written opinion. *Wright v. Sec. of Dept. Of Corr.*, 278 F.3d 1245, 1254 (11th Cir. 2002), *cert. denied*, 538 U.S. 906 (2003).

As to Petitioner's ineffective assistance of counsel claims in Grounds Two through Five,

these claims were raised in Petitioner's Rule 3.850 motion and rejected in two written opinions (Dkt. 8, Exs. 011 and 013). The appellate court per curiam affirmed the trial court's decisions (Dkt. 8, Ex. 018). Because these claims were raised in state court and rejected, the Court must deny the writ unless one of the two § 2254(d) exceptions applies. *See Mobley*, 267 F.3d at 1316. Having reviewed the record, the arguments presented by the parties, applicable statutes, and controlling case law, the Court finds that Petitioner has not met his burden in this regard.

**Ground One**

Petitioner asserts that his Fifth and Fourteenth Amendment rights were violated when the F.B.I. agent who took him into custody failed to provide him with a sufficient Miranda warning. Petitioner alleges that when the F.B.I. agent, Agent Brown, arrested him in New York, he verbally gave him a Miranda warning, then later at the F.B.I. headquarters, Agent Brown gave him a Miranda wavier form and showed Petitioner where to sign the form. Petitioner states he signed the form because Agent Brown informed him that the signature meant the Petitioner was agreeing to go to Florida to clear up the charges. He claims that Agent Brown began questioning him, then he asked Agent Brown whether an attorney should be present. He maintains that at that point, Agent Brown stopped questioning him and called Agent Bessie in to speak with Petitioner. Agent Bessie then asked Petitioner some questions, and Petitioner told him that he had shot the victim when the victim's friends were trying to hurt Petitioner. Petitioner claims that Agent Bessie never informed him of his Miranda rights.

He argues that Agent Brown's initial Miranda warning was inadequate because he failed to inform Petitioner that he had a right to have an attorney present before and during questioning, and that if he could not afford an attorney that one would be appointed for him. He also claims that

7

Agent Brown did not sufficiently explain the Miranda form to Petitioner, and he did not determine if Petitioner could read English and understand the form before Petitioner signed it. He argues, therefore, that the waiver of his Miranda rights was not knowingly and intelligently made, and the state court's denial of his motion to suppress his statements violated his Fifth and Fourteenth Amendment rights.

In state court Petitioner raised this issue on direct appeal (Dkt. 8, Ex. 003). He argued that the state trial court erred when it denied his motion to suppress his statements because they were not voluntarily made as Agent Brown's Miranda warning was inadequate for failing to advise Petitioner that if he could not afford an attorney, one would be provided to him at no cost. He also argued that he did not fully understand the constitutional rights form he signed, and Agent Brown did not make a "satisfactory effort" to determine if Petitioner understood the form.

At the hearing on the motion to suppress, Petitioner moved to suppress the statements he made to Agent Brown in the car after the arrest, the statements he made to Agent Brown at the F.B.I. office, and the statements he made to Agent Blasse after Petitioner asserted he wanted an attorney (Dkt. 8, Ex. 022, Vol. V at 604). Initially, Agent Blasse did not testify at trial, and the statements Petitioner made to him were not introduced at trial. Therefore, any claim that Petitioner's rights were violated when the state trial court denied Petitioner's motion to suppress Petitioner's statements to Agent Blasse are without merit.

At trial Agent Brown testified in pertinent part as follows:

*Q* At some point from the time that you took Mr. Jones custody to when you start travelling [sic] in your vehicle to Manhattan, do you give Mr. Jones his Miranda rights?

A Yes, I gave him certain constitutional rights.

8

Q Did you give him those from a written form or from memory?

A From memory.

Q Are you doing this as you're driving the vehicle?

A No, no I did it after we were stopped.

Q And what did you tell him?

A I told Mr. Jones that he had a right to remain silent. If he gave up that right anything he said could be used against him in a court of law. I told him he had the right to an attorney. If he had an attorney he had the opportunity to call that person. If he didn't have an attorney he would to talk with an attorney before he went to court.

Q And then did you place him in your vehicle?

A Either he was already in my vehicle at that time or yes, I did.

Q Did you tell Mr. Jones whether you were in fact going to speak to him as you traveled from that location back to Manhattan?

A I told Mr. Jones that I was not going to interview him concerning facts of the crime in Tampa. I told him that when we got back to the FBI office he would have the opportunity at that time to make a statement.

Q Do you have anything in your vehicle that would allow you to record anything that was said in that car?

A No, I don't.

Q On the ride back to Manhattan did you ever question Mr. Jones?

A I did not ask him questions, no.

Q On the ride back to Manhattan did Mr. Jones ever talk to you?

9

A Yes, he did.

Q What did Mr. Jones say to you?

\*\*\*

A Mr. Jones told me that on New Year's Eve 1996, he was on his way home from work and he stopped into a nightclub in Tampa. He called it the Jamaican Club. He stated that he began performing on a microphone in the club, a song. That after he finished performing he was approached by an individual in the club with a gun. Mr. Jones suggested that he had used a disparaging word in his performance and that this individual took insult to that word.

Q Did he tell you what that word was?

A Yes, he did.

Q What was the word that he said he said on the microphone?

A The word was pussy mouth.

Q Then what does he tell you happens after that?

A The individual approaching with a gun and told Mr. Jones that he wanted to talk to him. Mr. Jones saw two other men with this individual and that he saw one of the other men with a gun held down to the man's side, by his leg and the other man had his hands in his pockets. Mr. Jones believed both of these men were armed and the individual told Mr. Jones he wanted to talk to him.

Q And did Mr. Jones tell you what he thought they were mad at him about?

A He thought the individual took insult at his use of pussy mouth. He thought he was referring to that individual.

10

Q Did Mr. Jones tell you whether he thought about trying to get the gun away from any of these people?

A He did. He stated that he didn't want to wrestle with these individuals for the gun because he saw the other two men with him. So he was able to separate himself from these men and walk over to the bar area.

Q And then what did he tell you he did?

A He stated he waited at the bar for a little while and attempted to leave the bar and as he was walking towards the exit the individual who had spoken with him before approached him again and pulled a gun and at this time Mr. Jones grabbed the gun, wrestled it away from the individual.

Q And did Mr. Jones tell you what he did after he got the gun away from this person?

A He stated he shot the individual.

Q Now did he tell you whether he had ever actually left the bar from the first altercation to when he shot this person?

A No, no, he did not.

Q Did he tell you whether this altercation was over money or anything over [sic] than what he supposedly said on the microphone?

A He stated he had no money deals with this individual.

Q Did you ask Mr. Jones whether he had shot anyone else inside that bar?

A Yes, he told me that he did not think that anybody else had been shot.

Q And did Mr. Jones tell you what he did about the handgun after he had shot this person?

11

A He stated he dropped the handgun on the floor of the bar and then left.

Q Now I may have misstated earlier but you actually asked Mr. Jones any questions during the ride from Brooklyn to Manhattan?

A If I asked him anything it was to clarify something that he already had said. I didn't prompt him of any questions.

***

Q Once you arrived in Manhattan what was done with Mr. Jones?

A He was taken to our office base on the 28th floor and secured in an interview room.

Q Then did you give Mr. Jones his rights again or did you talk to him at all about his right again?

A I furnished a form to Mr. Jones which is entitled interrogation advise of rights and I asked Mr. Jones to read over the form and if he had any questions I would be happy to answer the questions for him.

Q Did you actually give that form to Mr. Jones?

A Yes, I did.

Q After you gave that to him, what did Mr. Jones do with it?

A I saw him read the form.

Q And showing you State Exhibit Number One. Please look at it at this time and tell me if you can identify that item.

A Yes, I can. This is the form that I furnished to Mr. Jones.

Q After reading it, did you ask Mr. Jones if he would sign it?

A Yes, I advised him that, I asked him if he wanted to sign it and told him that he didn't

have to.

Q Did Mr. Jones sign that in your presence?

A Yes, he did.

Q So his signature is on there?

A Yes, it is.

Q Did anyone else sign that document?

A I signed the bottom here as a witness and a detective at the time that was doing some paper work for the lodging of Mr. Jones signed the form.

***

Q After Mr. Jones was given the opportunity to read his rights did you ask him if he would speak with you?

A Yes, we began to talk about the incident in Tampa.

Q Now at any time when you were in contact with Mr. Jones did you ever have a reason to believe he was under the influence of alcohol or drugs?

A No.

Q When you would ask him a question would his answer be responsive to what you were asking him?

A Yes.

Q Did he appear to understand what you were talking to him about?

A Yes, he did.

Q Did he ever give you any indication that he was confused or didn't understand either the language you were using or the words that you were saying?

A No, he didn't.

Q Did you then ask him about what had happened in Tampa on January 1st 1997?

A Yes, I asked Mr. Jones to tell me what had happened in Tampa in his own words.

***

Q What did he tell you had happened in the bar in Tampa on January 1st of 1997 when you were at the FBI headquarters ?

A He related essentially the same story that he had told me in the car.

Q Okay. Did he tell you that he had been on a microphone?

A Yes, he did.

Q Did he tell you that he had used this profane word?

A Yes, he did.

Q About the same word that he told you in the car?

A Yes, it was.

***

Q And then what did he tell you happened afterwards?

A He -- after he dropped the gun on the floor I asked him if he --

Q No, I'm sorry. At FBI headquarters when he was telling you what happened and he said that on the microphone what did he tell you happened?

A - - um, again he went over the fact that he left the microphone and was walking across the -

***

Q What did he tell you?

14

A -- that he left the microphone and was approached by an individual who displayed a handgun. There were two other individuals with him and that this individual stated that he wanted to talk with Mr. Jones. Mr. Jones was able to separate himself from this individual. As he attempted to leave the bar this individual again intercepted Mr . Jones before he could exit, displayed a handgun and Mr . Jones grabbed it and wrestled it away and shot the individual.

Q But again his version at FBI headquarters was that never actually got to leave the bar between the first altercation and the shooting?

***

A That's correct.

***

Q Did he ever tell you he left the bar?

A No, he did not.

Q What did he you tell he did after he shot the man?

A He stated he dropped the gun on the floor of the bar and left the bar.

Q Did he tell you whether he knew the person he had shot?

A Yes, he did tell me that but he stated he did not know the individual only from seeing in [sic] that individual in that bar.

Q Did you ask him whether the altercation had to do with money?

A Yes, I did.

Q What was Mr. Jones' response?

A He stated no it did not.

Q Did he tell you where he planned to go after he left New York?

A Yes, he stated he wanted to surrender himself in Tampa but he wished to go to Jamaica

first and earn some money for an attorney.

(Dkt. 8, Ex. 022, Vol. IV at 423-434).

"The Self-Incrimination Clause...is not implicated by the admission into evidence of the

physical fruit of a voluntary statement." *United States v. Patane*, 542 U.S. 630, 636 (2004).

"Voluntary and spontaneous comments by an accused, even after Miranda rights are asserted, are

admissible evidence if the comments were not made in response to government questioning."

*Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991)(citations omitted). The record reflects

that even if, arguendo, Agent Brown's initial Miranda warning to Petitioner was insufficient,

Petitioner's statements to Agent Brown while in the car were not the product of interrogation, but

were spontaneously and voluntarily made. Therefore, the denial of Petitioner's motion to

suppress the statements he made in the car to Agent Brown was not a violation of Petitioner's

Fifth and Fourteenth Amendment rights.

During the hearing on the motion to suppress, Agent Brown testified that he furnished

Petitioner with a form which informed Petitioner of his constitutional rights (Dkt. 8, Ex. 022,

Vol. V at 571). Petitioner read the form and told Agent Brown that he did not have any questions

regarding the form (Id.). Agent Brown told Petitioner that Petitioner could sign the form, but he

was not required to do so, and Petitioner stated that he would sign it, and he did sign the form

(Id. at 571-72). Agent Brown testified that nothing gave him reason to believe that Petitioner

could not read English or that he did not understand his questions (Id. at 571-73). Thereafter,

Petitioner indicated to Agent Brown that he would be willing to talk to him about what had

happened on the night of the shooting (Id.).  After Petitioner talked to Agent Brown for a period of time, Petitioner asked Agent Brown whether he should have an attorney present, and at that point Agent Brown ceased questioning Petitioner (Id. at 575-76).

There is a two part inquiry into whether or not a defendant's waiver of *Miranda* rights was voluntary, knowing, and intelligent.  *U.S. v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995)(citing *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Barbour*, 70 F.3d at 585. "Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*  "Only if the totality of the circumstances surrounding the interview reveal an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.*

There is nothing in the record which indicates that Petitioner's relinquishment of his rights was anything but voluntary or that he was not fully aware of both the nature and consequences of his decision to abandon his Miranda rights.  Based upon the totality of the circumstances, the Court finds that Defendant was fully aware of the rights he was waiving, the consequences of that waiver, and freely, knowingly, and voluntarily waived his *Miranda* rights. Therefore, the denial of his motion to suppress the statements he made to Agent Brown at the F.B.I office did not violate his Fifth and Fourteenth Amendment rights.  Accordingly, Petitioner is not entitled to habeas relief on Ground One.

**Ground Two**

In Ground Two of his petition, Petitioner asserts ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)). In order to show a violation of the Sixth Amendment right to counsel, Petitioner must satisfy the two-pronged inquiry of *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Bell v. Cone*, 535 U.S. 685, 698 (2002)(courts should apply *Strickland* to claims that counsel failed to satisfy constitutional requirements at specific points). First, Petitioner must demonstrate that the attorney's performance was deficient, meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Second, Petitioner must prove prejudice, in that he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*,466 U.S. at 694. Petitioner must prove both prongs of *Strickland.* Therefore, if Petitioner fails to establish either deficient performance or prejudice, the court need not address the other prong. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,....that course should be followed."); *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

18

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment," a petitioner must demonstrate that error by counsel prejudiced the defense. *Strickland*, 466 U.S. at 691-92.

Petitioner claims his counsel was ineffective for failing to call Dondrue Faure (hereafter "Faure") as a witness at trial. He claims that Faure would have testified that she was inside the bar when she heard shots and saw a man who was not Petitioner leave the area where the victim was shot with a gun in his hand and a red spot on his shirt which appeared to be blood.

In his Rule 3.850 state post-conviction motion, Petitioner raised the claim that his counsel was ineffective for failing to move for postponement of the trial until Faure was served with a subpoena to appear at trial (Dkt. 8, Ex. 007). In denying the claim, the state trial court stated:

> In ground 6A, Defendant claims, ineffective assistance of counsel due to counsel's failure to move for postponement of the trial due to the Court's failure to subpoena Dondrue Faure. The record does reflect that on June 17, 1997, Assistant State Attorney, Christopher Watson, in his Notice of Discovery, did list Mr. Dondrue Faure as a category A witness pursuant to Florida Rule of Criminal Procedure 3.220 (b) (1) (A) (I) . (See Notice of Discovery, attached). However, on March 16, 1998, Defendant's counsel took Ms. Faure's deposition. (See Deposition of Ms. Dondrue Faure, attached). Ms. Faure's testimony at deposition with respect to the case was as follows:

19

I don't really know anything about the shooting itself. Like I told the detective that came by my house, when I was outside of the club and I heard the shooting I thought it was fire-crackers, because I was standing right by the door. And I thought somebody was playing a joke in there with the firecrackers.

But when I was standing there, because I knew that my friends were in there, I was trying to go back in. And a friend of mine was telling me not to. He was a Jamaican guy.

....

But when I was "since I was standing right there in front of the door, everybody started rushing out, and I was, like " I remember stating something like, "Who is playing a joke in there with firecrackers? That's not funny." And then I though [sic] I seen [sic] a gun, but it was - but I don't know. It was all happening so fast. I though [sic] I seen [sic] him, but then this has been such a long time ago. (See Deposition of Dondrue Faure, pages 9 and 10, attached).

Therefore, Ms. Faure's testimony would not have helped Defendant as Ms. Faure did not remember much, could not help the defense, nor hurt the State. Defendant has failed to meet the second prong of Strickland in that he has failed to prove how counsel's failure to postpone the trial until Ms. Faure could be subpoenaed resulted in prejudice as Ms. Faure's testimony would have neither helped the defense nor hurt the State. Since Defendant has failed to meet the second prong of Strickland, it is unnecessary to address the performance component. As such, no relief is warranted upon ground 6A.

(Dkt. 8, Ex. 011 at 5-6).

The trial court correctly identified the *Strickland* standard and did not apply it in an unreasonable manner. "Failing to call a particular witness constitutes ineffective assistance of counsel only when the absence of the witness's testimony amounts to the abandonment of a viable, outcome-changing defense." *See*, *Jordan v. McDonough*, 2008 U.S. Dist. LEXIS 831 (M.D. Fla. 2008)(citations omitted). "In all other cases, the failure to call a witness is either an objectively-reasonable strategic decision or a non-prejudicial error." *Id.*(citation omitted).

In light of the fact that other witnesses testified that they saw Petitioner shoot the victim, that Petitioner gave statements to Agent Brown that he had shot the victim, and that witnesses testified that other individuals in the bar had guns as well, the Court agrees with the state trial

court's determination that Faure's testimony would not have helped Defendant and did not

amount to an "outcome-changing defense."   Petitioner fails his burden of proving that the state

court's determination is an unreasonable application of controlling Supreme Court precedent or

an unreasonable determination of the facts.

**Ground Three**

Petitioner argues that he received ineffective assistance of counsel because his trial

lawyer did not call Petitioner's employer as a witness at trial.  Petitioner claims that his employer

would have testified that Petitioner was only issued two sets of his work uniform.  He argues that

witnesses testified that he was wearing a uniform shirt from his work just before the shooting,

and that Detective Black subsequently recovered two uniforms from Petitioner's car which were

tested but did not reveal any blood or gunpowder residue.  Petitioner maintains that had the jury

heard his employer's testimony, the jury would have had reasonable doubt, because there was no

physical evidence found on either of his uniforms, that he was the shooter.

Petitioner raised this claim as his Ground 6B in his Rule 3.850 state post-conviction

motion (Dkt. 8, Ex. 007).  In Ground 2 of the Rule 3.850 motion Petitioner also claimed he had

newly discovered evidence, a document from the City of Tampa's Parks Division, stating that

Petitioner was issued two uniforms (Id.).  In denying these claims, the state trial court stated:

> In ground 2, Defendant claims there is new evidence in the form of certified
> documentation from the City of Tampa Parks Security Division depicting all items that
> were issued to defendant upon employment. Defendant contends that there was
> undisputed evidence that Defendant was still dressed in the city's uniform when the
> incident occurred. Moreover, Defendant alleges that this documentation contradicts the
> State's theory and would have supported the Defendant was not close to the victim when
> he was shot and also the observation of a State's witness, Dondre Faure, that someone
> other than Defendant was seen leaving the area immediately after the shots were fired.
> However, although the letter mailed from the City of Tampa to Defendant lists the

number of items issued and returned to Defendant, it does not indicate whether Defendant could have obtained other uniform shirts from the city or from other employees. (See Letter from City of Tampa dated January 15, 1999, attached).

Moreover, contrary to Defendant's belief, the documentation does not contradict the State's theory that the uniform shirts recovered from Defendant's car were not one of the shirts worn by Defendant at the time of the offense. Robin Clark, Defendant's girlfriend at the time of the murder, testified that initially Defendant was not wearing his uniform that night. (See Trial Transcript Vol. III, p. 288, L: 8-16, attached). However, after he left he club before the shooting and returned he was dressed differently. (See Trial Transcript, Vol. III, p. 292, L: 22-25, p. 293, L: 1-6, attached). Ms. Clark testified that Defendant never left her after that time.  (See Trial Transcript Vol. III, p. 298, L: 16-18, attached). Ms. Clark testified that Defendant did not change the clothes he was wearing prior to driving to south Florida. (See Trial Transcript Vol. III, p. 300, L: 23-25, attached). Regardless of how many uniforms Defendant was originally assigned by the City of Tampa, it was the State's position, based on the testimony of Robin Clark, that Defendant wore the shirt that he was wearing when he shot the victim and on his way from Tampa to South Florida when he fled after the shooting. (See Trial Transcript, Vol. V, p. 487, L: 4-25, p. 488, L: 1-2, attached).

Furthermore, Defendant's newly discovered evidence could have been used to corroborate the State's version of events. Right before the victim was shot, he had been dancing with Deborah Limon. (See Trial Transcript Vol. III, p. 266, L: 9-13, attached). They had been together for several hours that evening. In her testimony, Ms. Limon described the shooter as wearing "dark pants, a white shirt with a badge." (See Trial Transcript Vol. III, p. 284, L: 4-5, attached). The letter from the City of Tampa indicates that although the uniforms issued to Defendant were returned, the badge was not. (See Letter from City of Tampa dated January 15, 1999, attached). Again, this would support the State's position that the uniform shirts recovered from Defendant's car were not one of the shirts worn by Defendant at the time of the offense.  As such, since Defendant's "newly discovered evidence"does not contradict the State's theory but rather supports it, no relief is warranted upon ground 2.

\*\*\*

In ground 6B, Defendant claims ineffective assistance of counsel due to counsel's failure to call Defendant's employer to testify as to the number of uniforms that were issued or produce documented proof as to the uniforms. In cases involving claims of ineffective assistance of counsel for failing investigate and interview witnesses, facially sufficient postconviction motions must include: (1) identity of prospective witnesses; (2) substance of witnesses; and (3) explanation as to how omission of such evidence prejudiced the outcome of trial. See Highsmith v. State, 617 So. 2d 825 (Fla. 1st DCA 1993);

As previously discussed in ground two, the "newly discovered evidence" presented by Defendant as to the number of uniforms that were issued to Defendant and returned do not contradict the State's theory that the uniform shirts recovered from Defendant's car were not one of the shirts worn by Defendant at the time of the murder. As such, Defendant fails to meet the Highsmith test in that he fails to explain how counsel's omission in failing to call his employer to testify prejudiced the outcome of trial. As such, no relief is warranted upon ground 6b.

(Dkt. 8, Ex. 011 at 137-142).

Initially, Petitioner's allegations are insufficient to support relief on this claim.

"[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (footnotes omitted). Hence, the "petitioner must first make a sufficient factual showing, substantiating the proposed witness testimony." *Percival v. Marshall*, No. C-93-20068 RPA, 1996 WL 107279, at *3 (N.D. Cal. Mar. 7, 1996), *affirmed*, No. 96-15724, 1997 U.S. Dist. LEXIS 9154 , 1997 WL 31219 (9th Cir. Jan. 23, 1997). "Such evidence might be sworn affidavits or depositions from the potential witnesses stating to what they would have testified." *Id*.

*Jordan v. McDonough*, 2008 U.S. Dist. LEXIS 831, at *13-14. Petitioner has not presented evidence of actual testimony or any affidavit of alleged testimony, and, accordingly, he has not made the requisite factual showing.

Furthermore, the Court agrees with the state trial court's determination that Petitioner fails to show how he was prejudiced. The employer's alleged testimony that Petitioner was issued two uniforms does not establish that Petitioner did not possess another uniform shirt. Moreover, in light of some of the witnesses' testimony that they saw Petitioner shoot the victim, and Petitioner's statements to Agent Brown that he did shoot the victim, Petitioner cannot show that the outcome of the trial would have been different had his employer testified that Petitioner was issued two uniforms.

23

Thus, the Court finds that Petitioner has failed to demonstrate by clear and convincing evidence that the state court's decision is contrary to or an unreasonable application of clearly established Supreme Court law or an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. 2254(d). Petitioner has not established that he is entitled to the relief he seeks on this claim.

**Ground Four**

In Ground Four, Petitioner claims counsel was ineffective for failing to follow Petitioner's proposed trial strategy and for failing to present a valid defense. Petitioner asserts that his proposed defense was that he did not shoot the victim. He also states that his counsel's defense was both that the State did not establish that Petitioner shot the victim, and that if he did shoot him it was in self-defense, and he complains that counsel's strategy was not valid because the two defenses contradict each other.

Petitioner raised this claim as his Ground 6D in his Rule 3.850 state post-conviction motion (Dkt. 8, Ex. 007). In denying this claim, the state trial court stated:

> In ground 6D. [sic] Defendant claims ineffective assistance of counsel due to counsel's failure to present a valid defense. The record reflects that counsel did provide a combined defense of self-defense and that the physical evidence (i.e. Defendant's uniforms) did not support the State's account of the shooting. (See Trial Transcript Vol. II, p. 108, L: 10-19, Vol. IV, p. 416-441, Vol. V, p. 478, L: 24-25, p. 479, L: 1-11, attached). Defendant exaggerates the importance of the uniforms being free of gunpowder and equates this is in his Motion to "if the gloves don't fit you have to acquit." However, this ignores the testimony of Defendant's then girlfriend, Robin Clark, that he did not change out of the clothes he was wearing during the shooting before he left town. (See Trial Transcript Vol. III, p. 300, L: 23-25, attached). Moreover, Defendant chooses to ignore the importance of his own statements admitting the shooting to FBI agent Thomas Brown. (See Trial Transcript, Vol. IV, p. 416-441, attached). Despite the evidence against Defendant, counsel was effective enough to get the first Degree Murder count reduced to Second Degree Murder and for the jury not to find Defendant guilty on the attempted murder counts. Therefore, Defendant has failed to meet the first prong of Strickland in that he has

failed to prove counsel failed to provide a valid defense. Since Defendant has failed to meet the first prong of <u>Strickland</u>, it is unnecessary to address the prejudice component. As such, no relief is warranted upon ground 6D.

(Dkt. 8, Ex. 011 at 143).

At the evidentiary hearing on Petitioner's 3.850 motion, trial counsel articulated to the state court the underlying reasons behind his tactical decisions (Dkt. 8, Ex. 012 at 354-75). He also testified that he had discussed the evidence and his trial strategy with Petitioner, and the reasons for his trial strategy (Id.). Despite Petitioner's claim that he did not shoot the victim, counsel felt compelled to introduce a self-defense strategy because of the evidence the State had which included eyewitnesses who claimed they saw Petitioner shoot the victim, and Petitioner's admissions to Agent Brown that he did shoot the victim (Id.). Further, because Petitioner claimed he did not shoot the victim, counsel also attempted to develop a strategy designed to raise doubt in the minds of the jury whether Petitioner actually shot the victim, which included questioning the witnesses about the lighting in the bar, the bullet shells, the lack of blood or gunpowder residue on the uniforms found in Petitioner's car, etc. (Id. at 371). Counsel also determined that it was crucial to have the last word with the jury during closing arguments,[1] and therefore, he decided not to call any witnesses, who, he believed, were not very helpful to Petitioner in the first place (Id. at 371-72). Finally, counsel testified at the hearing that Petitioner did not have a plausible explanation supporting his claim that he did not shoot the victim (Id. at 373-74).

---

[1] At the time of Petitioner's trial, Fla. R. Crim. P. 3.250(1998) provided that "a defendant offering no testimony in his or her own behalf, except the defendant's own, shall be entitled to the concluding argument before the jury."

25

Petitioner has not demonstrated that the defenses counsel presented at trial were anything other than trial strategy. Disagreements by a defendant with counsel's tactics or strategies will not support a claim of ineffective assistance of counsel. A habeas petitioner must overcome a presumption that the challenged conduct of one's counsel was a matter of strategy. *Strickland*, 466 U.S. at 689; *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). Counsel may raise inconsistent and alternative defenses at trial if it is reasonable to do so. *See Harich v. Dugger*, 844 F.2d 1464, 1470 (11th Cir. 1988)(citation omitted). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d at 386 (11th Cir. 1994). Because evidence presented at trial indicated that Petitioner did shoot the victim, and because Petitioner was facing a possible first-degree murder conviction, the Court cannot find that no reasonable lawyer would have pursued counsel's trial strategy.

Even assuming, arguendo, that counsel's performance was deficient, Petitioner fails to show that counsel's actions prejudiced Petitioner such that the outcome of his trial would have been different. In the absence of an allegation of prejudice, a claim of ineffective assistance of counsel cannot succeed because the requirements of *Strickland* remain unsatisfied. Based on the bare allegations presented to support this claim and the evidence adduced at the state evidentiary hearing, the state court's rejection of this claim was a reasonable application of *Strickland*. Petitioner is not entitled to federal habeas relief on this claim.

**Ground Five**

Petitioner's final claim is that his counsel was ineffective for failing to object to the court

26

giving a self-defense jury instruction.  Petitioner claims that the self-defense jury instruction

confused the jury in such a way that it convinced the jury that Petitioner did shoot the victim.

Petitioner raised this claim as Ground 6C in his Rule 3.850 motion (Dkt. 8, Ex. 007).  In

denying the claim, the state trial court stated:

> In ground 6C, Defendant claims ineffective assistance of counsel due to counsel's
> failure to object to any instruction on self defense. Specifically, Defendant claims the
> defense never raised the issue of self-defense and therefore, the jury should never have
> been instructed on self-defense. In its response to Ground 6C of Defendant's Motion, the
> State determined that the testimony provided in the instant case provided a factual
> background which would have supported a theory of self-defense and as such the Court
> will incorporate the State's response into its present order. (See State's Answer, attached).
> There is a right to a self-defense instruction where there has been sufficient evidence to
> support it. See Dames v. State, 773 So. 2d 563 (Fla. 2d DCA 2000). Therefore, contrary
> to Defendant's allegation, Counsel would have been ineffective for failing to request an
> instruction on self-defense under the circumstances. As such, Defendant fails to meet the
> first prong of Strickland in that he fails to prove counsel acted deficiently for failing to
> object to any instruction on self-defense. Since Defendant has failed to meet the first
> prong of Strickland, it is unnecessary to address the prejudice component. As such, no
> relief is warranted upon ground 6C.

(Dkt. 8, Ex. 011 at 142).

In Florida, "[u]pon request, a defendant is entitled to a jury instruction on any theory of

defense the substantive evidence supports, however weak or improbable his testimony may have

been." *Mathews v. State*, 799 So. 2d 265, 266 (Fla. 1st DCA 2001).  There was testimony that

the victim had pulled a gun on Petitioner the night of the shooting (Dkt. 8, Ex. 022, Vol. III at

331-38).  Agent Brown testified that Petitioner told him that the victim approached Petitioner and

pulled a gun on him, and Petitioner wrestled the gun away from the victim and shot him (Dkt. 8,

Ex. 022, Vol. IV at 426).  Petitioner's counsel emphasized through Agent Brown that Petitioner

believed he was acting in self-defense (Id. at 437-38).  Clearly, there is evidence in the record

27

that supports the theory that Petitioner shot the victim in self-defense.

At the evidentiary hearing on Petitioner's 3.850 motion, counsel testified that because the evidence at trial supported a claim of self-defense, he believed it was prudent to obtain a jury instruction on self-defense and "[t]o do otherwise would have left the jury whether [sic] it's first degree murder or not guilty and no other options." (Dkt. 8, Ex. 012 at 359). The Court agrees with the state trial court's determination that under the circumstances counsel would have been "ineffective for failing to request an instruction on self-defense." *See Mathis v. State*, 2006 Fla. App. LEXIS 17642, at *13 (Fla. 1st DCA Oct. 25, 2006)("[A]rguing that the jury should find appellant not guilty because he was acting in self-defense and then failing to request an instruction on that theory was patently unreasonable and, thus, subject to collateral attack."). Accordingly, Petitioner fails to demonstrate counsel's performance was deficient for failing to object to the self-defense jury instruction.

Petitioner fails his burden of proving that the state court's determination is an unreasonable application of controlling Supreme Court precedent or an unreasonable determination of the facts.

### Conclusion

For reasons set forth *supra*, the Court finds that Petitioner has not demonstrated that he is entitled to federal habeas relief.

ACCORDINGLY, the Court **ORDERS** that:

1.   The Petition for Writ of Habeas Corpus is **DENIED** (Dkt. 1).

2. The **Clerk** shall enter judgment against Petitioner, terminate all pending motions, and

28

close this case.

**DONE and ORDERED** in Tampa, Florida, on _February 29th_____, 2008.


_____
JAMES D. WHITTEMORE
United States District Judge

SA:sfc

Copy to: All Parties/Counsel of Record